## MOLNAR v. COMMISSIONER OF INTERNAL REVENUE.

### No. 249, Docket 20158.

Circuit Court of Appeals, Second Circuit.

June 24, 1946.

John J. Sweedler, of New York City, for petitioner Ferenc (Franz) Molnar.

Sewall Key, Acting Asst. Atty. Gen., and J. Louis Monarch and·Norman S. Altman, Sp. Assts. to Atty. Gen., for respondent Commissioner of Internal Revenue.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The question presented by the petition to review the order of the Tax Court determining a deficiency of $3,684.71 in the income tax of the taxpayer Molnar for the year 1941 is whether the latter has established that any part of the lump-sum payments he received from American motion pictures producers for his world .motion picture rights constituted income from sources outside of the United States within the meaning of Sections 119 and 212 of the Internal Revenue Code.[1]

On April 17, 1941 the taxpayer, a citizen

---

[1] "Sec. 119. Income from sources within United States

"(a) Gross income from sources in United States. The following items of gross income shall be treated as income from sources within the United States:

* * * * * * * *

"(4) Rentals and royalties. Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like property;

* * * * * * * *

"(c) Gross income from sources without United States. The following items of gross income shall be treated as income from sources without the United States:

* * * * * * * *

"(4) Rentals or royalties from property located without the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using without the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like properties;

* * * * * * * *

"(e) Income from sources partly within and partly without United States. Items of gross income, expenses, losses and deductions, other than those specified in subsections (a) and (c) of this section, shall be allocated or apportioned to sources within or without the United States, under rules and regulations prescribed by the Commissioner with the approval of the Secretary. Where items of gross income are separately allocated to sources within the United States, there shall be deducted (for the purpose of computing the net income therefrom) the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of other expenses, losses or other deductions which can not definitely be allocated to some item or class of gross income. The remainder, if any, shall be included in full as net income from sources within the United States. In the case of gross income derived from sources partly within and partly without the United States, the net income may first be computed by deducting the expenses, losses, or other de-

of Hungary, entered into a written contract in New York City with R. K. O. Radio Pictures, Inc., whereby for a consideration of $19,750, he assigned to R. K. O. Radio Pictures, Inc., the sole and exclusive motion picture rights throughout the world in a play, of which he was the author, entitled "The Play's The Thing." The contract recited that the play was registered for copyright in the United States Copyright Office in 1926 and 1927. The rights acquired by R. K. O. Radio Pictures, Inc., were never exercised and no motion picture was ever produced from them but evidence was introduced that the corporation in its production of motion pictures for the year 1940 received 66 per cent of its income from domestic sources and 34 per cent from sources without the United States; in its production of motion pictures for the year 1941 it received 65 per cent of its income from domestic sources and 35 per cent from sources without the United States, and in its production of motion pictures for the year 1942 it received 69 per cent of its income from domestic sources and 31 per cent from sources without the United States.

On August 26, 1941, the taxpayer assigned to one Boris Morros, a domestic motion picture producer residing in the United States, motion picture rights throughout the world to a short story, of which the taxpayer was the author, entitled "the Marshal," for the consideration of $2,550. "The Marshal" had been registered for copyright in the year 1929. The motion picture rights sold to Boris Morros were exercised by him in the production of a motion picture called "Tales of Manhattan," of which "The Marshal" was a part. The picture "Tales of Manhattan" was distributed by Twentieth Century-Fox Film Corporation in 1942. From August 1942 Twentieth Century-Fox Film Corporation received $1,886,741.10 as gross income for exhibiting

the picture "Tales of Manhattan" in the United States up to December 30, 1944, and $1,219,646 for exhibiting it throughout the foreign field up to the end of November 1944. The receipts from foreign sources of Twentieth Century-Fox Film Corporation for "Tales of Manhattan" during the year 1941 were therefore in the neighborhood of 39 per cent of the aggregate receipts from that picture from both domestic and foreign sources. The percentage attributable to "The Marshal" was not shown.

The taxpayer, in computing his income tax for 1941, deducted from his gross income—as the portion properly attributable to sources without the United States—40 per cent of the lump-sum payments received for licensing the above motion picture rights in the two works we have mentioned. The Commissioner disallowed the deductions and found that the entire income received by the taxpayer during the year 1941 should have been reported as income from sources within the United States. He accordingly determined the deficiency of $3,684.71, which the Tax Court affirmed. In reaching its determination the Tax Court followed its own decision in Estate of Alexander Marton, 47 B.T.A. 184, where proof was introduced by the taxpayer of receipts by the licensee in the United States and foreign countries from the production and exhibition of pictures other than the one there in question. But the Tax Court said: "We think that a segregation of the purchase price upon the basis of income derived by the corporation from its production and exhibition of other pictures in this and foreign countries would be wholly unjustified. It would have been a simple matter for the parties to have segregated the purchase of the domestic from the foreign rights. This they did not do and we cannot supply that omission by surmise. For all we know, the foreign

ductions apportioned or allocated thereto and a ratable part of any expenses, losses, or other deductions which can not definitely be allocated to some items or class of gross income; and the portion of such net income attributable to sources within the United States may be determined by processes or formulas of general apportionment prescribed by the Commissioner with the approval of the Secretary. * * *" 26 U.S.C.A. Int.Rev.Code, § 119.

"Sec. 212. Gross Income.

"(a) General rule. In the case of a non-resident alien individual gross income includes only the gross income from sources within the United States. * * *" 26 U.S.C.A. Int.Rev.Code, § 212.

rights to this picture were considered of little or no value. * * * " We recently affirmed the Tax Court in Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, cert. den. 66 S.Ct. 1367, upon a record closely similar to the one now before us where the court reached the same result as here.

The taxpayer argues that the statistics of Metro-Goldwyn-Mayer appearing in the opinion in Estate of Alexander Marton, and those of R. K. O. and Twentieth Century-Fox set forth in the present case have indicated an average proportion between foreign and domestic receipts from the exhibition of moving pictures that is sufficiently reliable to have required the Commissioner and the Tax Court to allow a deduction of 33⅓ per cent from the lump-sum payments for the two pictures as representing income from sources' outside of the United States that.was under the terms of the Revenue Act not subject to income taxes. In weighing the taxpayer's argument we are not unmindful of our decision in Cohan v. Commissioner, 2 Cir., 39 F.2d 540, but do not think that it is controlling upon the present case. There we only held that some deduction should have been allowed by the Commissioner and the Board of Tax Appeals for business expenses because of credible testimony that there had been such expenses as well as a general estimate by the witness of the amounts expended during the taxable year.

▆▆ Certainly if the decisions of the Tax Court are to be regarded as conclusive as to all questions of fact, as the Supreme Court has indicated, we cannot say that the determination in this case was without any warrant. The question before the Commissioner was not what the licensed picture yielded to the licensees but what portions of the lump sums paid as advance royalties for the moving picture rights were a consideration for the privilege of using the copyrights "without the United States." It is easy enough to see the difficulty the taxpayer has in establishing the deduction he seeks when the contracts with his licensees have made no segregation, but it is impossible to require the Tax Court to make an allowance for consideration received by the taxpayer for the privilege

of using his copyrights abroad when the statistics from the business receipts of R. K. O. offered as a guide reflected experience based on all kinds of pictures which were not shown to have been similar to taxpayer's plays in plot, character or scenery. The statistics relating to the license of "The Marshal" to Morros were even more inconclusive. It is impossible even to surmise what portion of the earnings of "Tales of Manhattan" was derived from the incorporation of "The Marshal" in the latter, still less to determine what portion of the lump sum paid by Morros to the taxpayer was paid for the privilege of showing the play outside of the United States. Such statistics afforded no basis for any fact-finding tribunal to make an estimate of what was paid for the privilege of using the rights in foreign countries.

We think that a statement in the licenses of the amounts, if any, allocated to uses outside of the United States would have evidential value though, like any other recital of consideration, it would be subject to contradiction or modification by proof that it did not accord with the real facts. Likewise perhaps, experts familiar with the business of licensing similar plays and with the potentialities of a given picture for foreign and domestic exhibition might furnish valuable opinion evidence as to what proportion of the consideration would probably have represented a payment for the privilege of exhibition outside of the United States. Perhaps such proof as we have suggested would have required the Commissioner to allocate some part of the consideration to foreign use and to allow a deduction from the taxpayer's gross accordingly, but we find no sufficient basis for such an allocation in the record before us.

The order of the Tax Court is affirmed.

L. HAND, Circuit Judge (concurring).

It seems to me that in Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, we overruled sub silentio, Cohan v. Commissioner, 2 Cir., 39 F.2d 540, a decision which had stood for sixteen years, had been often cited, never with disapproval I think. Moreover, Rohmer v. Commissioner, supra, so far as I can see, is directly contrary to

Helvering v. Taylor, 293 U.S. 507, 513, 515, 55 S.Ct. 287, 79 L.Ed. 623, which I had supposed decided that, when it appeared that a taxpayer was entitled to something, it was an error for even the Tax Court to deny him any allowance whatever, although of course we should be bound to accept whatever that allowance might be. Here it is clear beyond doubt that the payments were made in some part for the foreign copyrights; yet the Tax Court has refused any allowance at all because Molnar has not shown how much; and I am unable to understand my brothers' reasoning by which they reconcile that result with the law, as I understand it was before Rohmer v. Commissioner, supra. However, I think that only in the rarest instances should we overrule so recent a decision of our own court, however much in a court differently constituted the judges may disagree with it; for it is as much the function of the Supreme Court to decide differences within a circuit as between circuits. Therefore I yield to the authority of Rohmer v. Commisssioner, supra, and what I am now saying is only to record my personal disagreement.